## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DAKOTA PERRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 11-CV-470-TLW** |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | |
| **Acting Commissioner** | ) | |
| **of the Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Dakota Perry seeks judicial review pursuant to 42 U.S.C. § 405(g) of the decision of the Commissioner of the Social Security Administration denying plaintiff's applications for disability insurance benefits under Title XVI of the Social Security Act.[2] In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. (Dkt. # 14). Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. For the reasons discussed below, the Court REMANDS the decision of the Commissioner.

## INTRODUCTION

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable

---

[1] Effective February 14, 2013, pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act. 42 U.S.C. § 405(g).

[2] Plaintiff has previously received supplemental security income benefits based on disability as a child. Upon reaching the age of eighteen, his eligibility for these benefits was redetermined under the eligibility standards for adults. (R. 71, 75).

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."[3] 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Id.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005).

---

[3] When an individual seeks redetermination of disability at age eighteen, the step to determine if an individual is engaging in substantial gainful activity is not used. 20 C.F.R. § 416.987(b).

Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the Administrative Law Judge's ("ALJ's") findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision should stand. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff received supplemental security income benefits as a child. However, his eligibility was re-determined at age eighteen, and he was found to no longer be disabled. (R. 26). Plaintiff alleges that he is unable to work due to issues with Darier Disease, psoriasis, mild dextro-scoliosis, attention deficit/hyperactivity disorder, mild mental retardation, and bipolar disorder. (R. 28).

Plaintiff's claim was denied initially on March 4, 2009 and on reconsideration. (R. 26). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (R. 61). The hearing was held on April 27, 2010. (R. 977-1005). The ALJ issued a decision on May 28, 2010, denying benefits and finding plaintiff not disabled. (R. 7-25). The Appeals Council declined plaintiff's request to review the case but accepted additional evidence from plaintiff's counsel and included the additional evidence in the administrative record. (R. 2-5). The ALJ's decision serves as the final decision of the Commissioner. Id.

On appeal, plaintiff alleges six main points of error. He argues that the ALJ failed: (1) to properly consider all the relevant evidence; (2) to support a finding that plaintiff's Darier disease did not meet or equal a listing with substantial evidence; (3) to properly consider the treating physician's opinion; (4) to properly consider plaintiff's credibility; (5) to support his residual functional capacity ("RFC") assessment with substantial evidence; and (6) to support his finding that there are a significant number of available jobs for him with substantial evidence. (Dkt. # 18 at 5).

**<u>Work History</u>**

Prior to and during plaintiff's redetermination of benefits, plaintiff worked at Robertson Tire as a tire tech for forty hours a week. His job duties included changing, rotating, and balancing tires. Plaintiff stated his manager at Robertson Tire is a friend of the family and that he always worked with a supervisor. (R. 994-995).

Plaintiff had also previously worked at Atwoods, also under supervision. The amount of supervision is unclear however: plaintiff stated that he was "'supervised all the time'" and that a supervisor "checked on [him] every [thirty] minutes." (R. 995). Regarding his work at Atwoods, plaintiff testified that for every fifteen to twenty minutes worked, he took a ten to fifteen minute break. Plaintiff also said that he can sit for thirty to thirty five minutes, but that he needs to stand for ten to fifteen minutes afterward. (R. 996-997).

Plaintiff testified that he cannot write for more than ten minutes at a time because he experiences pain in his palms, and that standing for prolonged periods of time causes pain as well.

**<u>Residual Functional Capacity Assessments</u>**

In December 2008, Lise M. Mungal, M.D., a Disability Determination Services (DDS) physician, gave plaintiff a light physical RFC due to plaintiff's lack of extensive lesions (under Listing 8.05), negative results from x-rays taken of his back, and activity level. (R. 647-648).

Two months later, Burnard Pearce, Ph.D., also a DDS physician, noted that plaintiff's records show a history of ADHD, bipolar disorder, and a lower than average borderline intellect. Dr. Pearce found that plaintiff's daily living activities were mildly limited and his social functioning was moderately limited. He also found plaintiff's concentration, persistence, and pace to be moderately limited, and he found that plaintiff had experienced one or two episodes of decompensation, each of which lasted for an extended duration. (R. 587-599). Based on the same record, Dr. Pearce completed a Mental Residual Functional Capacity Assessment, which noted plaintiff's marked limitation in the ability to understand, remember, and carry out detailed instructions and to interact appropriately with the general public. (R. 583-586).

In February 2009, Dr. Mungal completed another RFC Assessment based on the record as it existed in February 2009. (R. 576-582). Dr. Mungal found that plaintiff's immune deficiency, which resulted in his psoriasis, was not disabling and that plaintiff's scoliosis failed to meet a listing, due to its mild nature. Dr. Mungal also noted that plaintiff's activities were normal for an eighteen year old living at home. (R. 577). Dr. Mungal's RFC provided that plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight hour workday, sit for about six hours in an eight hour workday and push and/or pull unlimited amounts, other than what he can lift and/or carry. <u>Id.</u>

On May 17, 2009 a DDS physician completed an Advisory Physical Residual Functional Capacity Assessment. He found that the claimant is able to "occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8 hour workday, sit about 6 hours in an 8 hour workday, and push and/or pull on an unlimited basis, other than as shown for lifting and/or carrying." (R. 548-555).

DDS Physician, Tom Shadid, Ph.D., completed an Advisory Psychiatric Review Technique Form on June 16, 2009. (R. 560-573). Plaintiff's learning disability, ADHD and bipolar disorder were noted, and plaintiff was found to be mildly limited with respect to activities of daily living; moderately limited in reference to maintaining social functioning; moderately limited with respect to maintaining concentration, persistence, or pace; with one or two episodes of decompensation, each of extended duration. (R. 570). Dr. Shadid also completed an Advisory Mental Residual Functional Capacity Assessment. (R. 556-559). He noted that plaintiff had a marked limitation in his ability to understand, remember and carry out detailed instructions, and was markedly limited in his ability to interact with the general public appropriately. (R. 556-557).

**Medical Records**

Plaintiff testified that his Darier disease[4] "covers his body" and causes his skin to crack and bleed. He stated the disease flares up, making him unproductive at work. (R. 989). In September 2007, a physician[5] who examined plaintiff noted plaintiff's lesions were "resolved."

---

[4] Darier Disease is a condition of the skin characterized by yellowish, hard, greasy, and sometimes odiferous wart-like blemishes. People may experience flares of the disease over time, which can be influenced by environmental factors such as rubbing, sunlight exposure, heat, and humidity. GENETICS HOME REFERENCE, NATIONAL INSTITUTE OF HEALTH, http://ghr.nlm.nih.gov /condition/darier-disease (last visited February 22, 2013).

[5] The physician's signature is illegible.

(R. 606-621). However, on November 6, 2009, David Min, M.D., noted that plaintiff's back had hyperpigmentation of his dry skin and generalized psoriasis.

Plaintiff testified that he smokes half a pack of cigarettes daily, that he quit drinking alcohol two months prior to his hearing, and that he quit smoking marijuana one month prior to his hearing. (R. 984-986).

In October 2008, the school nurse found that plaintiff had elevated blood pressure which had been ongoing for three to four months. He then presented to Stephanie Burleson, D.O. at Utica Park Clinic with heart palpitations. Plaintiff denied illegal drug use to Dr. Burleson, but tested positive for opiates. At this time, he stated he had taken a Lortab from his sister. (R. 661-663). On July 13, 2009, plaintiff was only taking half of his medication. He also stated he "drinks beer every once in awhile." (R. 505).

In April 2009, Lawrence J. Gregg, M.D., plaintiff's treating physician, submitted a statement which specified that plaintiff would require "extensive assistance and education so that he may find a place in the useful work force that does not require exposure to heat, humidity, and/or equipment which rubs against his skin." (R. 575).

Dr. Gregg's records are dated February 2, 2009 through December 16, 2009. (R. 529-537). During this time, Dr. Gregg reported variance in plaintiff's Darier Disease from "Flared. Not good" on July 8, 2009 to having a "flare up" of his Darier Disease with "Moderate Staphylococcus Aureus" on the patient's "mid-back" with a "possible infection" on October 12, 2009. Id. On November 24, 2009, the patient's Darier disease was "better." Throughout this time period, the patient was prescribed at-home treatments such as bleach baths, as well as several rounds of antibiotics and ointments. Id.

On November 23, 2009, plaintiff presented to Family and Children's Services. He had been off of his medications for a month, but began taking them again a week before his appointment, at which time he had a manic episode. At this point, he began taking Invega and Wellbutrin again. (R. 504). Plaintiff denied having suicidal or homicidal thoughts, or using alcohol or drugs.

Plaintiff moved home so his family could monitor his compliance with his medications more closely. Id. Plaintiff does not claim any problem interacting socially with persons other than his family.

On March 29, 2010, plaintiff presented to Family and Children's Services, where he saw Dr. Land. Plaintiff stated he used marijuana "a couple times per month, but not every month." (R. 503-504).

### **Mental Impairments**

Plaintiff testified to having issues with anger and depression on a daily basis, which caused him to be aggressive. (R. 638-639). These behaviors did not occur at school, according to plaintiff. (R. 639).

In May 2008, plaintiff presented to Family and Children's Services stating his moods were "out of control." (R. 643). Two months later, plaintiff was seen again at Family and Children's Services, where he stated that he had discontinued his medications and subsequently had rages. Due to these rages, plaintiff was hospitalized at OSU/TRMC; while he was there, his Wellbutrin dosage was increased to 300 mg. He was also diagnosed with bipolar disorder, ADHD and mild mental retardation. (R. 644).

In October 2008, plaintiff's mood was stable. (R. 630). Two months later, Dr. Pearce, a DDS physician, noted that plaintiff had a history of ADHD, bipolar disorder, and a lower than

average borderline intellect. Dr. Pearce stated plaintiff's daily living activities were mildly limited; his social functioning was moderately limited; his concentration, persistence, and pace were moderately limited, and plaintiff had one or two episodes of decompensation, which lasted for an extended duration.

On March 29, 2010, plaintiff presented to Family and Children's Services. He had ceased taking his medications for months due to a perceived lack of improvement while on them. He also reported irritability, having physical altercations, and recurrent depression. Dr. Land noted plaintiff's diagnosis of bipolar disorder, his alcohol and cannabis abuse, and his noncompliance. (R. 502).

**Physical Impairments**

In September of 2007, an x-ray of plaintiff's right hand revealed a minimally displaced fracture of the fifth metacarpal head. (R. 622). In 2007, a CT scan of plaintiff's head showed no abnormalities and his lesions were notably "resolved." (R. 606, 621).

In October 2008, plaintiff complained to Dr. Burleson of lumbar pain which radiated to his right leg. Plaintiff said that the pain had been present for six months and that sitting exacerbated the problem. Plaintiff also reported using an anti-hypertensive medication and wearing a holter monitor for his heart palpitations. (R. 630, 661). Plaintiff's back pain was also reportedly worse in November of 2008.

In May 2009, plaintiff was diagnosed with lower back strain at Saint John's Medical Center after presenting to the Emergency Room with pain. He was given prescriptions for pain killers and muscle relaxers, and was instructed to refrain from working for five days. (R. 510-518).

Plaintiff had an MRI performed on his lumbar spine on November 3, 2009. The test showed mild disc bulging at the L3-L4 and L4-L5 levels, with a suggestion of mild right neural foraminal stenosis at L4-L5. Otherwise, the MRI was "unremarkable." (R. 547).

Three days later, on November 6, 2009, plaintiff saw Dr. Min. During this appointment, plaintiff stated he had been treated for a metacarpal fracture in September of 2007. Plaintiff's mother reported he had been treated with Occupational Therapy for the last six months and had received an MRI for back pain. Plaintiff also reported constant numbness and tingling in his right leg. (R. 545-546).

Dr. Min's assessment indicates that plaintiff was able to rise to an erect position without difficulty, and that he had a non-antalgic myopathic gait.[6] Plaintiff also had pain when flexing, extending, and bending laterally, but he had a negative straight leg raise. (R. 546). In a letter to Dr. Burleson, Dr. Min noted that upon review of the MRI taken of plaintiff's lumbar spine, he did not believe that plaintiff needed surgery, and plaintiff's mother was unhappy with this interpretation. In the end, Dr. Min ordered plaintiff to receive a single epidural steroid injection at L5 on the right, with a follow-up in two weeks. Id. Plaintiff received this injection on November 19, 2009, which he tolerated without side effects. Plaintiff was instructed to complete treatment with a follow up in the next couple of weeks. (R. 543).

On December 8, 2009, plaintiff followed up with Dr. Min and reported that the shot had reduced his pain, but the pain had already returned. Dr. Min noted plaintiff had no difficulty

---

[6] A non-antalgic myopathic gait is a limp characterized by "exaggerated alternation of lateral trunk movements with an exaggerated elevation of the hip" but is not a way of walking used to avoid "pain on weight-bearing structures, characterized by a very short stance phase." MEDICAL DICTIONARY, THE FREE DICTIONARY, http://medical-dictionary.thefreedictionary.com/Myopathic +Gait (last visited Feb. 22, 2013); (citing SAUNDERS, DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS (2007)).

ambulating and did not have any focal weakness. (R. 541). The doctor recommended a second steroid injection, which was performed on December 29, 2009. (R. 540).

Plaintiff followed up with Dr. Min on January 19, 2010. He had improved, but continued to suffer from back stiffness, tightness, and pain. Plaintiff had minimal difficulty ambulating and no focal weakness; thereafter, Dr. Min told plaintiff that there was nothing more the doctor could do for him, but he advised plaintiff to cease smoking and to exercise within his back limitations. (R. 539).

**The ALJ's Decision**

The ALJ found that plaintiff continues to suffer from several severe impairments, including Darier disease, psoriasis, mild dextro-scoliosis, attention deficit/hyperactivity disorder, mild mental retardation, and bipolar disorder. (R. 24). However, the ALJ found that plaintiff did not have an impairment or combination of impairments which met or equaled a Listing, specifically, Listings 12.04(B) or 12.04(C). (R. 12). The ALJ also did not find plaintiff's Darier disease disabling. He based his opinion partly on a DDS physician's opinion from December 8, 2008, which states that plaintiff's dermatology records "do not show extensive lesions under the meaning of [Listing 8.05]," and another DDS physician's opinion that plaintiff's psoriasis flares do not meet the requirements for a disability. (R. 21).

The ALJ determined that plaintiff had the residual functional capacity to perform less than the full range of light exertional work as defined in 20 C.F.R. § 416.967(b). The ALJ specifically found that plaintiff could lift and/or carry twenty pounds occasionally; lift and/or carry ten pounds frequently, and stand and/or walk six hours out of an eight hour workday in intervals lasting ten to fifteen minutes. The ALJ also found that plaintiff can sit for six hours out of an eight hour workday for intervals lasting from thirty to thirty-five minutes. The ALJ noted

that plaintiff, in the past, has been able to climb ladders, ropes, and scaffolds, and bend and stoop occasionally, but was not able to use his hands for power gripping or power twisting and was told to avoid concentrated exposure to wetness and all exposure to harsh chemicals. The ALJ found plaintiff could perform simple tasks in a habituated work setting without "intense interpersonal contact with the general public, co-workers or supervisors." (R. 13).

In reaching his decision, the ALJ found that plaintiff's complaints of pain were not credible, citing inconsistency between plaintiff's claims and plaintiff's reported activities, including work activity at Robertson Tire, Atwoods, Noodles and plaintiff's failure to take his prescriptions. (R. 20-22). The ALJ believed that plaintiff exaggerated his symptoms, such as disabling pain, and that his reported activities such as his work at Robertson Tires, Atwoods, Noodles, and at school were not congruent with his reported pain level. (R. 20-21).

The ALJ found that plaintiff lacked credibility due to plaintiff's marked noncompliance regarding the taking of his medications and lack of consistency between plaintiff's purported symptoms and impairments. (R. 21). The ALJ also noted inconsistencies between the medical records and plaintiff's claim of disabling back pain: "[o]n October 30, 2008, the claimant reported he ha[d] been 'physically sick with back pain,' however, three days previously, the claimant reported he ha[d] taken 'Aleve with improvement,' which is inconsistent with disabling back pain, as has been alleged by the claimant." (R. 21). The ALJ also discredited plaintiff's claims of "constant" numbness and tingling based on plaintiff's MRI and plaintiff's ability to ambulate without problems and without "focal tenderness." (R. 21-22). The ALJ discredited the severity of plaintiff's rages and anger outbursts because plaintiff admitted that he only becomes angry at home, but not at school or work. (R. 22). Moreover, the ALJ discredited plaintiff's testimony due to inconsistencies in plaintiff's reported marijuana, alcohol, and drug habits. For

example, the ALJ noted that plaintiff reported not drinking because he did not like it; yet, plaintiff had used alcohol for the two years prior to the hearing despite having been advised not to drink. The ALJ also noted that plaintiff had tested positive for opiates previously. Id. Finally, the ALJ noted that plaintiff had still performed semi-skilled work for the past two years without "apparent absences due to his medical condition." Id.

The ALJ also rejected records and opinions from Dr. Gregg, plaintiff's treating physician. Dr. Gregg opined that plaintiff required work which permitted him to take frequent breaks, and that plaintiff suffers from "chronic infections of the skin . . . with ulcerating skin lesions persist[ing] on a continuous basis." These lesions, according to Dr. Gregg, only allowed plaintiff to "occasionally stand/walk, occasionally use his arms for reaching, pushing and pulling and occasionally use his hands for grasping, handling, fingering and feeling." (R. 22-23). The ALJ rejected Dr. Gregg's opinions because the ALJ found them to be inconsistent with Dr. Gregg's records. The ALJ also found that plaintiff's work history was inconsistent with Dr. Gregg's opinion. Specifically, the ALJ noted plaintiff's current job at Robertson Tire, his previous employment at Atwoods, and his past work as a dishwasher. (R. 23).

The ALJ did not cite to testimony by two lay witnesses – plaintiff's manager and his special education teacher. However, the ALJ found that based on plaintiff's RFC, he was not able to return to any of his past relevant work as a "stocker, bagger, dishwasher, or tire changer." Id.

Accounting for plaintiff's young age, high school education, communication skills, unskilled past relevant work, and residual functional capacity, the ALJ found that there were significant numbers of jobs available which plaintiff could perform. (R. 24). The ALJ found that plaintiff could perform unskilled light work according to the Medical Vocational Guidelines; but

because plaintiff's ability to perform all or substantially all work requirements at that level was impeded by additional limitations, the ALJ sought testimony from a vocational expert. The vocational expert testified that several jobs were available to plaintiff in the national and regional economy, even with plaintiff's need for supervision. Based on these findings, the ALJ concluded that there were jobs, such as sorter, messenger and inspector/checker, that plaintiff could perform in the regional and national economy. (R. 24). Thus, the ALJ found plaintiff "not disabled." Id.

## ANALYSIS

### The ALJ Did Not Fail to Consider All Relevant Evidence

Plaintiff argues on appeal that several pieces of evidence were not properly considered by the ALJ, despite their relevance. Plaintiff argues the ALJ did not consider Dr. Gregg's records, plaintiff's allegations that he needs coaching and verbal cues to complete tasks, or information from plaintiff's special education teacher and from plaintiff's manager. (Dkt. # 18). The Commissioner argues that because plaintiff has not shown how the evidence would change the ALJ's decision, and because plaintiff has not provided any transcript cites to evidence the ALJ should have addressed, plaintiff has waived this argument under Murrell v. Shalala, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994); United States v. Rodriguez-Aguirre, 108 F.3d 1228, 1237 n. 8 (10th Cir. 1997); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), cert. denied, 494 U.S. 1082. (Dkt. # 19 at 4). Plaintiff's reply brief states "[w]hile the ALJ is not required to discuss every piece of evidence he 'must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.' Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996)." (Dkt. # 20).

Plaintiff alleges the ALJ erred in finding that his Darier Disease does not equal Listing 8.00. "We review the Secretary's decision to determine whether her factual findings are

supported by substantial evidence in the record viewed as a whole and whether she applied the correct legal standards." Castellano v. Sec'y of Health and Human Servs., 26 F.3d 1027, 1028 (10th Cir. 1994) (citing Andrade v. Sec'y of Health & Human Servs., 985 F.2d 1045, 1047 (10th Cir. 1993)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Castellano, 26 F.3d at 1028; (citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). The District Court does not reweigh the evidence. Hamilton v. Sec'y of Health & Human Servs., 961 F.2d 1495, 1498 (10th Cir. 1992).

The only impairment plaintiff raises on appeal is Darier Disease, which the ALJ did not find met a listing. The ALJ relied on a December 8, 2008 opinion from a DDS physician. The opinion states that plaintiff's dermatology records "do not show extensive lesions under the meaning of Listing 8.05." The ALJ also relies on a second DDS physician's opinion that plaintiff's psoriasis flares do not meet the requirements for a disability. (R. 504, 647-648). Plaintiff also argues that the ALJ did not consider evidence in deciding whether plaintiff's condition met or equaled a listing, and that the ALJ erred in not using the medical records from Dr. Gregg. (Dkt. # 18 at 7). Plaintiff does acknowledge, however, that the ALJ noted and followed the State Agency finding that plaintiff's flares "did not meet the requirement for a disability." Id.

Plaintiff alleges the ALJ erred in not finding his Darier Disease met or equaled a listing under 8.00 "skin disorders." While it is true that the ALJ did not specifically state that "at Step Three, plaintiff failed to meet or equal Listing 8.00," the ALJ did analyze plaintiff's Darier Disease at other steps of the sequential analysis. "[A]n ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a

claimant's impairments do not meet or equal any listed impairment." Fischer-Ross v. Barnhart, 431 F.3d 729, 733 (10th Cir. 2005). In addition, "[i]f such findings 'conclusively preclude Claimant's qualification under the listings at step three' such that 'no reasonable factfinder could conclude otherwise,' then any step three error is harmless." Murdock v. Astrue, 458 Fed. Appx. 702, 704 (10th Cir. 2012) (unpublished)[7], (citing Fischer-Ross, 431 F.3d at 735). However, if there are no findings at other steps that "conclusively negate the possibility" that a claimant can meet or equal a listing, we must remand to the ALJ for further findings. Clifton, 79 F.3d at 1009-1010.

The ALJ specifically cited two DDS opinions both of which state that plaintiff's Darier Disease does not meet a listing. The ALJ cites to Dr. Mungal's opinion that plaintiff does not have extensive lesions under Listing 8.05. (R. 647). The ALJ also cites Dr. Mungal's evaluation from February 23, 2009, which states that plaintiff's psoriasis flares did not meet the "requirements for disability." (R. 577). It is clear that the ALJ specifically cited a listing which was not met and that the ALJ considered evidence in deciding whether plaintiff's condition met or equaled a listing. Moreover, the ALJ explained that he did not use Dr. Gregg's records or opinions about plaintiff's Darier Disease due to inconsistency. Fischer-Ross, 431 F.3d at 733.

Based on the foregoing, there is substantial evidence supporting the ALJ's finding that plaintiff does not meet the requirements for a finding of disability under the Listings.

**The ALJ's RFC Assessment Is Supported by Substantial Evidence**

Plaintiff alleges that the ALJ's RFC assessment is not supported by substantial evidence. Plaintiff specifically alleges that Dr. Gregg "clearly does not agree with the ALJ's assessment," and that plaintiff's manager and special education teacher both "agree that plaintiff cannot

---

[7] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

complete tasks without extra supervision." (Dkt. # 18 at 10). Plaintiff's argument is essentially that according to his manager and his special education teacher, plaintiff needs a job coach, which the vocational expert stated would eliminate competitive employment.

The vocational expert *only* testified that plaintiff would lack competitive employment under Dr. Gregg's Medical Opinion regarding Residual Function Capacity. (R. 1004). The vocational expert's analysis provided that "*based upon [plaintiff's] testimony*" plaintiff would not be able to do other jobs without accommodation or job coach. (R. 1003-1004). The ALJ explained that he did not use plaintiff's testimony due to credibility issues. As such, he does not need to follow the vocational expert's analysis if that analysis is based on plaintiff's testimony.

The question is whether or not the ALJ buttressed his RFC analysis with substantial evidence notwithstanding the fact that he ignored statements from two witnesses. Not explicitly discussing lay witness testimony is not grounds for remand when the evidence is cumulative. Brescia v. Astrue, 287 Fed. Appx. 626, 630-31 (10th Cir. 2008) (unpublished); (citing Clifton, 79 F.3d at 1009–10). If the ALJ's opinion states that he considered all of the evidence, the general practice "is to take a lower tribunal at its word when it declares that it has considered a matter." Hackett, 395 F.3d at 1173.

Here, the ALJ did not discuss the testimony of plaintiff's manager or plaintiff's special education teacher. However, the vocational expert considered plaintiff's need for supervision. (R. 1000-1005). As a result, the evidence would be cumulative and is not grounds for remand. Breschia, 287 Fed. Appx., at 630-631. Moreover, the ALJ's opinion states that he considered all of the evidence; therefore, the Court takes the ALJ at his word. (R. 12). See Hackett, 395 F.3d at 1173.

**The Finding that a Significant Number of Other Jobs Are Available
Is Supported by Substantial Evidence.**

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the hypothetical failed to relate all of plaintiff's impairments. Specifically, plaintiff argues that the failure to include in the hypothetical his need to be in a habituated environment was error. "'[T]estimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision." Hargis v. Sullivan, 945 F.2d 1482, 1492 (10th Cir. 1991) (citing Ekeland v. Bowen, 899 F.2d 719, 724 (8th Cir.1990)).

The ALJ gave the vocational expert the following hypothetical:

> Okay. I want you to assume a 19-year-old individual with a high school education and work experience as you've outline [sic] in your report and through testimony today. This individual could lift – I'm going to limit him to 20 pounds occasionally, 10 pounds frequently, with pushing and pulling consistent with the lifting and carrying restrictions. . . . The individual could do simple tasks. The job should be obituated with no intense interpersonal contact with co-workers, supervisors or the public. And by that I mean he should not be involved in team building, jobs that require persuasive influence such as commission sales or where he is in conflict or might be put in positions of conflict . . . With those restrictions would that individual be able to do any of the claimant's past relevant work?

(R. 1000-1001). Although the transcript reads "obituated environment," it is clear that the vocational expert and the ALJ were referring to a habituated environment. If this conclusion were not obvious from the transcript, the ALJ's inclusion in his decision of a reference to plaintiff's need for a "habituated environment" makes it so. (R. 13) ("[T]he claimant has been able to perform simple tasks in a habituated work setting, with no intense interpersonal contact with the general public, co-workers or supervisors.") Plaintiff's argument is based on a spelling error, and is without merit. (R. 1001).

**Treating Physician's Opinion**

Plaintiff argues the ALJ erred in not accepting the opinion of plaintiff's treating physician for three reasons: (1) the ALJ failed to explain specifically his reason for rejecting the opinion of plaintiff's treating physician; (2) the ALJ improperly rejected the opinion of plaintiff's treating physician by finding that it was inconsistent with plaintiff's past work history; and (3) that the ALJ lacked specificity in finding Dr. Gregg's opinion was inconsistent with plaintiff's work at Robertson Tire.

A sequential analysis is performed to determine whether a treating physician's opinion should be given controlling authority. First, the ALJ must determine whether the opinion qualifies for "controlling weight," by determining whether it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and whether it is consistent with the "other substantial evidence in the case record." Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 1993). If the answer is "no" to the first part of the inquiry, then the analysis is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. Id. "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

Even if the ALJ finds the treating physician's opinion to be inconsistent with the other substantial evidence in the record, treating physician opinions are still entitled to deference and must be evaluated in reference to the factors enumerated in 20 C.F.R. § 404.1527. Those factors are as follows:

> (1) the length of the treating relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is

a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001). The ALJ must give good reasons in his decision for the weight he ultimately assigns the opinion. Id. (citing 20 C.F.R. § 404.1527(d)(2)). If the ALJ rejects the opinion completely, he must give specific, legitimate reasons for doing so. Id. (citing Miller v. Chater, 99 F.3d 972, 976 (10th Cir. 1990)). The reasons must be of sufficient specificity to make clear to any subsequent reviewers the weight the adjudicator gave to the treating physician's opinion and the reasons for that weight. Hamlin v. Barnhart, 365 F.3d 1208, 1215 (10th Cir. 2004) (quoting Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003)); Anderson v. Astrue, 319 Fed. Appx. 712, 717 (10th Cir. 2009) (unpublished).

The ALJ's failure to cite to specific instances of inconsistencies between Dr. Gregg's opinion and Dr. Gregg's medical records fails the Tenth Circuit standard. Drapeau, 255 F.3d at 1213-14 (citing Clifton, 79 F.3d at 1009) ("[i]n the absence of ALJ findings supported by specific weighing of the evidence, we cannot assess whether relevant evidence adequately supports the ALJ's conclusion"); Kepler v. Chater, 68 F.3d 387, 391 (10th Cir.1995) (ALJ's listing of factors he considered was inadequate when court was "left to speculate what specific evidence led the ALJ to [his conclusion]"). Although we review the ALJ's decision for substantial evidence, "we are not in a position to draw factual conclusions on behalf of the ALJ." Prince v. Sullivan, 933 F.2d 598, 603 (7th Cir. 1991).

Here, the ALJ found that Dr. Gregg's opinion was entitled to no weight. Specifically, the ALJ rejected Dr. Gregg's opinion regarding plaintiff's residual functional capacity because it conflicted with Dr. Gregg's own records. The ALJ pointed to Dr. Gregg's opinion that "recurrent infections occur with 'variable frequency'" and "persist on a continuous basis" "often" and "can last for weeks or months at a time," but Dr. Gregg's "own records do not corroborate the

frequency, with which he has stated these infections occur." (R. 22-23.) The ALJ does not, however, cite to any specific instances in Dr. Gregg's records which are inconsistent with the opinions above. For this reason, plaintiff's case must be remanded so that the ALJ can provide appropriate cites or revise his opinion.

The ALJ also rejected Dr. Gregg's opinion that plaintiff could only "'occasionally' stand/walk" due to its inconsistency with the claimant's work history as a tire changer at Robertson Tire, as a dishwasher, and at Atwoods. (R. 23). Plaintiff argues that because the jobs as a dishwasher and at Atwoods occurred *before* Dr. Gregg's opinion was written, the ALJ cannot use the jobs to explain inconsistencies with Dr. Gregg's opinion. (Dkt. # 18 at 8). This argument is unfounded. An ALJ may reject a treating physician's opinion when it is inconsistent with the record before him. Drapeau, 255 F.3d at 1213. Plaintiff's previous and current work experience is part of the record; as such, it was proper for the ALJ to consider it in determining that Dr. Gregg's opinion is inconsistent with plaintiff's work experience.

**The ALJ Did Not Err in Making His Credibility Assessment**

Plaintiff argues that the ALJ improperly assessed his credibility about plaintiff's lesions, flares, ability to write for no more than ten minutes, and need for supervision. Plaintiff also argues that the ALJ erred by only assessing plaintiff's credibility as to his back pain and behavior.

This Court will not disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Sec'y of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990)). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of

findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler, 68 F.3d at 391 (quoting Hargis, 945 F.2d at 1489).

The ALJ provided multiple reasons, with evidentiary citations, for his finding that plaintiff was not credible. The ALJ cited plaintiff's failure to take his medications, contrary to his physician's direction. (R. 21). The ALJ noted that the claimant's symptoms were not consistent with his impairments, noting that "[o]n October 30, 2008, the claimant reported he had been 'physically sick with back pain,' however, three days previously, the claimant reported he took 'Aleve with improvement' which is inconsistent with disabling back pain." The ALJ found that plaintiff's complaints of "constant" numbness and tingling lacked credibility because they were inconsistent with plaintiff's MRI results and plaintiff's ability to ambulate normally without "focal tenderness." (R. 21-22).

The ALJ discredited plaintiff's rages and anger outbursts because plaintiff admitted that he only becomes angry at home, but not at school or work. (R. 22). Finally, the ALJ noted inconsistencies in plaintiff's reported marijuana, alcohol, and drug habits, noting that although plaintiff reported not drinking because he did not like it, plaintiff admitted that he drank alcohol for two years prior to the hearing, despite having been advised not to do so. The ALJ also noted that plaintiff had previously tested positive for opiates. Finally, the ALJ noted that plaintiff reported several conditions, but had performed semi-skilled work for the past two years without

"apparent absences due to his medical condition" and had gone to work during flares, although reportedly doing less work as a result.

The ALJ obviously considered several factors in assessing plaintiff's credibility, including plaintiff's attempts to obtain relief, the nature of his daily activities, the "consistency or compatibility of nonmedical testimony with objective medical evidence" and "subjective measures of credibility that are peculiarly within the judgment of the ALJ." Kepler, 68 F.3d at 391. The ALJ also linked these factors, and his findings, to substantial evidence in the record. Id.

## CONCLUSION

For the reasons set forth above, the Commissioner's decision is **REMANDED** for further proceedings to allow the ALJ to articulate how Dr. Gregg's records and opinions were inconsistent with each other. The ALJ's decision is otherwise affirmed.

SO ORDERED this 12th day of March, 2013.

_____
T. Lane Wilson
United States Magistrate Judge